# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs August 1, 2017

## IN RE SETH B., ET AL.

### Appeal from the Juvenile Court for Sevier County
No. 16-000175, 16-000176, 16-000178, 16-000179     Dwight E. Stokes, Judge

_____

### No. E2017-00173-COA-R3-PT

_____


This is a termination of parental rights case. Mother/Appellant appeals the termination of her parental rights to the minor children on the grounds of: (1) abandonment by an incarcerated parent by wanton disregard; (2) abandonment by willful failure to provide a suitable home; (3) failure to substantially comply with the reasonable requirements of the permanency plan; and (4) persistence of the conditions that led to the children's removal from Mother's home. Mother also appeals the trial court's finding that termination of her parental rights is in the children's best interests. Father/Appellant appeals the termination of his parental rights to the minor children on the grounds of: (1) abandonment by willful failure to provide a suitable home; (2) failure to substantially comply with the reasonable requirements of the permanency plan; and (3) persistence of conditions that led to the children's removal from Father's home. Father also appeals the trial court's finding that termination of his parental rights is in the children's best interests. Because grounds for termination of both Mother's and Father's parental rights are met by clear and convincing evidence, and there is also clear and convincing evidence that termination of Mother's and Father's parental rights is in the best interests of the children, we affirm.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and W. NEAL MCBRAYER, JJ., joined.

Robert L. Huddleston, Maryville, Tennessee, for the appellant, Antwoine O.; and Elizabeth A. Brady, Sevierville, Tennessee, for the appellant, Elizabeth E.

Herbert H. Slattery, III, Attorney General and Reporter; and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

This case concerns four minor children, Seth B. (d.o.b. January 2003), Darius E. (d.o.b. May 2005), Damian O. (d.o.b. March 2008) and Seriah O. (d.o.b. January 2011) (together "the Children").[1] Elizabeth E. ("Mother") is the mother of all four children. Antwoine O. ("Father") is the father of Damian O. and Seriah O. Mother and Father were never married,[2] but Father is listed on Damian O.'s and Seriah O.'s birth certificates and has held himself out as their father.[3] Mother and Father have been in an on-again-off-again relationship for eleven (11) years. Although Seth B. and Darius E. are not Father's biological or adopted children, he considers himself to be their father.[4] As discussed, *infra*, all of the children have behavioral issues, which require individual therapy.

The Department of Children's Services' ("DCS" or "Appellee") removed the Children from Mother and Father's custody on November 5, 2014. When Child Protective Services ("CPS") investigators arrived at the motel where the family was living, they observed unsuitable living conditions. Mother tested positive for methamphetamine, suboxene, and marijuana. Father was not present when investigators arrived, but, when CPS investigators were able to drug test him, he had a clean screen. By order of November 7, 2014, the Sevier County Juvenile Court ("trial court") granted temporary custody of the Children to DCS.

By order of December 17, 2014, the trial court adjudicated the Children to be dependent and neglected, finding, in relevant part, that:

> Upon the evidence presented, statements of counsel and the record as a whole, the [c]ourt finds that clear and convincing evidence has been established pursuant to T.C.A. § 37-1-129(c) to show that the [C]hildren are dependent and neglected within the meaning of the law; that removal of the

---

[1] In termination of parental rights cases, it is the policy of this Court not to use the last names of minor children and other parties in order to protect their identities.

[2] The record demonstrates Mother may still be married to a man she married in 2001, though there is only brief mention of this marriage in the record.

[3] Neither Father nor Mother ever filed a petition to establish Father's parentage to either child. However, Father is listed on Damian O.'s and Seriah O.'s birth certificates. He also held himself out as their father, and he entered into a permanency plan regarding both of the children, which establishes him as the putative biological father of Damian O. and Seriah O. *See* Tenn. Code Ann. § 36-1-117(c)(4)-(6); *see also* Tenn. Code Ann. § 36-2-304(a)(4).

[4] At the time of trial, the State believed Seth B.'s father was Aaron B. Even though Aaron B. was listed in the termination petition, he had not been served at the time of the final hearing, and DCS did not pursue termination of his parental rights at that time. The only parties to the termination at issue on appeal are Elizabeth E. and Antwoine O.

[C]hildren is required pursuant to T.C.A. § 37-1-114(2); that there is no less drastic alternative to removal; that it is contrary to the [C]hildren's welfare to remain in the care, custody or control of the parent(s); and that clear and convincing evidence has been established to show that that [sic] the [C]hildren are dependent and neglected for the following additional reasons: at the time of the removal, all four of the children were in the care and custody of their mother, [Elizabeth E.], and [Antwoine O.], the father of Damian & [sic] Seriah. On 11-5-2014 [sic], the Department's case managers, Bree McGrane and James Bradley arrived at the family home . . . responding to a referral of drug exposed child(ren). Mother, who appeared disoriented at the time of the interview, met the case managers and acknowledged that she would test positive on a drug screen for Suboxene. [Mother] submitted to a urine drug screen and did test positive for Meth, Suboxene, and THC. [Mother] informed the case managers that [Father] had been using Meth and Suboxene with her.

Mother had recently been admitted in-patient to Peninsula for five days to address her mental health needs.

[Father] had recently lost his job but as of November 5, 2014 he was working with a friend, cleaning cabins. The case manager(s) spoke to him on the telephone and he acknowledged that if he took a drug screen he would test positive for THC and maybe a pain pill. When he did arrive at the home and consent to a drug screen, his urine was clear and he tested negative for all substances.

The case managers observed the home to be in poor conditions; [sic] i.e. the home was filled with roaches, dirty dishes, limited food for the [C]hildren, and refuse lying about the home.

During the pendency of this case, there were two DCS case managers assigned to the family, Maureen DiRoma and Katie Rudder. Ms. DiRoma was the initial case manager, and Ms. Rudder took over as case manager when Ms. DiRoma left DCS in April 2016. DCS worked with Mother and Father to establish two permanency plans. The first permanency plan was entered on December 2, 2014, and the second permanency plan was entered on August 10, 2015. Both plans were later ratified by the trial court.

Concerning the services DCS provided, the record shows that DCS contracted with Holston Home in July 2015 to provide services to the parents and the Children. Tommy Delbridge was the caseworker from Holston Home assigned to the family. DCS also assisted Mother and Father in obtaining a suitable home in August 2016, but the parents were soon evicted from this home for failing to pay rent. Both parents lived a transient lifestyle during the pendency of this case, and neither parent could provide

evidence that he or she was able to maintain stable, legal employment for more than a few consecutive weeks. Throughout these proceedings, Mother has continued to struggle with her drug addiction. Father has left Mother on occasion only to return. He has continued to give Mother money to support her drug habit. Father testified that after receiving a settlement in a personal injury case, he gave the money to Mother, and she used it to buy drugs.

On February 4, 2016, DCS filed its petition to terminate Mother and Father's parental rights. DCS sought termination of Mother's parental rights on the grounds of: (1) abandonment by wanton disregard by an incarcerated parent; (2) abandonment by incarcerated parent by failure to support;[5] (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plan; and (5) persistence of conditions. DCS sought termination of Father's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; and (3) persistence of conditions.

Mother's drug addiction and unaddressed mental health issues and Father's inability to separate himself from her for the benefit of the Children are the primary concerns in this case. Even after filing the petition to terminate parental rights, DCS continued to work with the Appellants. Mother was in rehab four (4) times during the pendency of this case. At the time of trial, Mother was still struggling with drug addiction. During the first day of testimony, Mother was in withdrawal from methamphetamine.[6] The second day of trial Mother testified by telephone from a rehabilitation facility. While Father made strides to separate himself from Mother, in his testimony, he indicated that he could not leave her for more than two weeks. At the November 23, 2016 trial, Father testified that he had employment and had been living in Ohio for two weeks. Prior to trial, Father failed to mention his move or employment status to DCS.

By order of January 23, 2017, the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by an incarcerated parent by wanton disregard; (2) abandonment by willful failure to provide a suitable home; (3) failure to substantially comply with the reasonable requirements of the permanency plan; and (4) persistence of the conditions that led to the Children's removal from Mother's home. The trial court terminated Father's parental rights on the grounds of: (1) abandonment by willful failure to provide a suitable home; (2) failure to substantially comply with the reasonable requirements of the permanency plan; and (3) persistence of conditions that led to the Children's removal from Father's home. The trial court also found, by clear and

---

[5] In its closing arguments DCS conceded this ground, and the trial court did not rely on it in terminating Mother's parental rights. Therefore, we will not address this ground.
[6] The first day of the final trial took place on October 28, 2016. The second day of trial took place on November 23, 2016.

convincing evidence, that termination of Appellants' parental rights was in the Children's best interests. Mother appealed on January 23, 2017, and Father appealed on January 24, 2017. Both Appellants signed their notices of appeal. Tenn. Code Ann. § 36-1-124(d).

## II. Issues

Mother raises five issues for review, which we restate as follows:

1. Whether the trial court erred in terminating Mother's parental rights on the ground of abandonment by wanton disregard by an incarcerated parent?

2. Whether the trial court erred in terminating Mother's parental rights on the ground of abandonment by failure to provide a suitable home?

3. Whether the trial court erred in terminating Mother's parental rights on the ground of substantial noncompliance with the permanency plan?

4. Whether the trial court erred in terminating Mother's parental rights on the ground of persistence of conditions?

5. Whether the trial court erred in finding that termination of Mother's parental rights is in the best interests of the Children?

Father raises four issues as stated in his brief:

1. Whether the trial court properly found that the ground for termination of parental rights for abandonment due to failing to provide a suitable home by [Father] was shown by clear and convincing evidence, with specific reference to the requirement that the Department must provide reasonable efforts equaling or exceeding that of a parent within the requisite time period?

2. Whether the trial court properly found that the ground for termination of parental rights for noncompliance with the permanency plans by [Father] was shown by clear and convincing evidence?

3. Whether the trial court properly found that the ground for termination of parental rights for persistent conditions was shown by clear and convincing evidence?

4. Whether the trial court properly concluded that it was in the best interests of the children to have the parental rights of [Father] terminated at this time, with specific reference to the lack of pre-adoptive home in this case?

### III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***Nash-Putnam v. McCloud***, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. ***Nash-Putnam***, 921 S.W.2d at 174-75 citing ***Santosky v. Kramer***, 455 U.S. 745 (1982). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) citing Tenn. Code Ann. § 36-1-113(g). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." ***In re Taylor B.W.***, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We must then make our "own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." ***In re Bernard T.***, 319 S.W.3d 586, 596-97 (Tenn. 2010). We review the trial court's conclusions of law de novo with no presumption of correctness. ***In re J.C.D.***, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." **In re Angela E.**, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

## A. Abandonment

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of abandonment by an incarcerated parent by wanton disregard and failure to provide a suitable home pursuant. Tenn. Code Ann. § 36-1-113(g)(1); Tenn. Code Ann. § 36-1-102(1)(A)(ii); and Tenn. Code Ann. § 36-1-102(1)(A)(iv). The trial court found, by clear and convincing evidence, that Father's parental rights should be terminated on the ground of abandonment by failure to provide a suitable home. In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1).

### 1. Abandonment by Incarcerated Parent by Wanton Disregard Vis a Vis Mother

Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> ***
>
> (iv) A parent ... is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent ... has been incarcerated during all or part of the four (4) months immediately

preceding the institution of such action or proceeding, and ... the parent ... has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Tennessee Code Annotated Section 36-1-102(1)(A)(iv) applies only where "the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of [a parental termination] proceeding." In this case, the trial court made the following specific findings concerning the ground of abandonment by an incarcerated parent by wanton disregard:

At the time of the filing of the Department's petition, [Mother] was incarcerated or had been incarcerated for some of the last four months prior to February 4, 2016. She admitted this.

Here, DCS filed the petition to terminate parental rights on February 4, 2016. Mother was incarcerated from August 13, 2015 until November 10, 2015, which is within the four months preceding the filing of DCS' petition to terminate her parental rights. Therefore, the trial court correctly held that the abandonment definition of Section 36-1-102(1)(A)(iv) was applicable. *See **In re Keith W.**, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at *6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); **In re Navada N.**, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under section 36-1-102(1)(A)(iv)).

Concerning what constitutes wanton disregard, for purposes of this ground, this Court has explained that:

Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. **In re Audrey S.**, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." **Id.** The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." **Id.**

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009). We further note that the ground of abandonment by wanton disregard does not require that the conduct at issue occur within the four months prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). Rather, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated."); *but see In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) (concluding that father's actions that led to his incarceration did not constitute wanton disregard for the child's welfare because father did not know that mother was pregnant with his child). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, 2015 WL 3611244, at *3.

In its order terminating Mother's parental rights, the trial court found, in relevant part, that:

> [Mother's] incarceration serve[d] only as the triggering event though; the [c]ourt has considered her pre-incarceration behavior and [found] that the State has carried its burden that [M]other had numerous convictions for DUI, possession, assault, violation(s) of probation, leaving the scene, other serious driving violations. State did establish wanton disregard.

> [Mother's] criminal offenses were coupled with chronic drug use over a period of several years . . . in looking at the totality of the circumstances it all relates to her inability to get away from the drug culture and her failure to fulfill her responsibilities. . . . She has abandoned her children in all aspects of parenting and her actions reflect little regard if any for the wellbeing of [the Children].

Turning to the record, from the time Seth B. was born, in January 2003, Mother engaged in criminal behavior. In July 2003, Mother was arrested for domestic assault and was sentenced to public service and anger management classes. Darius E. was born in May 2005. In September 2006, Mother was arrested for DUI and later pled guilty to that offense. Damian O. was born in March 2008. In the same month, Mother pled guilty to violating her probation. Seriah O. was born in January 2011. In September 2011, Mother was cited for driving with a suspended license and for having no insurance. She was later convicted of those offenses. In October 2011, Mother again pled guilty to

violation of her probation. In December 2012, Mother was found in possession of schedule IV drugs and later pled guilty. In June 2013, Mother kicked out the back window of a police car when she was arrested on two outstanding warrants; she subsequently pled guilty to vandalism. In the same incident, Mother struggled to pull away from the arresting officer's control and was charged with (and later pled guilty to) resisting arrest. In August 2013, Mother again pled guilty to violating her probation. In August 2014, Mother was stopped for driving with a suspended license and no insurance and for leaving the scene of an accident; she later pled guilty to those charges. The Children were in the back seat of the car at the time of this incident. In November 2014, the same month DCS was awarded custody of the Children, Mother spit in a police officer's face after being transported to jail for public intoxication and later pled guilty to assault. Subsequently, Mother pled guilty to another violation of probation in August 2015. Mother was incarcerated from August 2015 until November 2015. The petition to terminate Mother's parental rights was filed on February 4, 2016.

Most of Mother's frequent arrests can be linked to her drug addiction. In fact, Mother concedes this in her appellate brief—that drug use has contributed to her criminal behavior. The record clearly establishes that Mother has a long history of drug abuse. Mother testified that she overdosed on methamphetamine when she was 17 and did not use again for 12 years. We can infer from Mother's testimony that she resumed using methamphetamine in 2013, after the Children were born. Trial Exhibit 20 is an October 2013 affidavit from Mother's Probation Officer which states, in pertinent part, that:

> [Mother] is not in compliance with court ordered treatment. [Mother] failed the clean drug screen policy by testing positive for Cocaine, Opiates, Oxycodone and THC.

With regard to parental drug use as a factor in determining wanton disregard, we have explained:

> Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, **State v. J.M.F.**, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); **In re C. LaC.**, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); **State v. Wiley**, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); **In the Matter of Shipley**, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." **In re Audrey S.**, 182 S.W.3d at 867-68.

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at \*5 (Tenn. Ct. App. Dec. 22, 2009). Despite her testimony that she wants to be a parent to these Children, the record clearly indicates that drugs, not her Children, have been her primary priority. Mother has had many opportunities to pursue a drug-free life but has not availed herself of these opportunities. Instead, she continues, even up to the date of the hearing on the petition to terminate her parental rights, to use illicit drugs. Her addiction has caused great detriment. She has been arrested, incarcerated, and has lost custody of her Children, yet her drug use persists. The record clearly establishes that Mother has engaged in conduct prior to her incarceration and throughout these proceedings that evinces a wanton disregard for the welfare of the Children. Accordingly, we affirm the trial court's order terminating Mother's parental rights on the ground of abandonment by an incarcerated parent by wanton disregard.

## 2. Abandonment by Willful Failure to Provide a Suitable Home Vis a Vis Mother and Father

The trial court found that both Mother and Father abandoned the Children by willful failure to provide a suitable home. Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> \*\*\*
>
> (ii) The child has been removed from the home of the parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a

- 11 -

parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

Mother and Father argue that DCS failed to make reasonable efforts to assist them in establishing a suitable home for the Children. As noted by the trial court, Tennessee Code Annotated Section 36-1-102(1)(A)(ii) requires DCS to make "reasonable efforts" related to housing during the relevant time period.[7] Here, the trial court found, in relevant part:

> The Sevier County Juvenile Court adjudicated these [C]hildren as dependent and neglected on December 17, 2014. The [C]hildren were removed due to D&N from both of these people. It is clear that DCS provided reasonable efforts after removal. DCS worked with [M]other and tried to maintain communication with her. DCS had a constant willingness to work with the parents and there was clear communication from the Department. DCS provided transportation for [M]other. DCS made efforts with respect to both parents even though the parents were very difficult to work with, because of the drug use that had continued on with both parents and extremely substantial use by [M]other for many months.

With regard to DCS' reasonable efforts, we have held that DCS' "efforts need not be 'Herculean,'" but "[r]easonable efforts [must] entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems [DCS] has identified in the permanency plan, whether the parents ask for assistance or not." *State Dept. of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. Dec. 30, 2008); *see also In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6-7 (Tenn. Ct. App. July 13, 2015) (reversing the ground of abandonment by failure to provide a suitable home where "the record is devoid of any evidence that DCS made any efforts related to housing during the relevant time period"); *In re Josephine E.M.C.*, No. E2013-02040-COA-R3-PT, 2014 WL 1515485, at *19-20 (Tenn.

---

[7] Although the Tennessee Supreme Court has overruled caselaw requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights," *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.34 (Tenn. 2015), pursuant to the requirements in Tennessee Code Annotated Section 36-1-102(1)(A)(ii), when termination is sought on the ground of abandonment for failure to establish a suitable home, DCS must make reasonable efforts "to assist the parent… to establish a suitable home for the child…." *See In re Yariel S., et al.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469 (Tenn. Ct. App. Jan. 6, 2017), at *6 (concluding that the record lacked any evidence as to DCS' efforts related to housing and reversing the abandonment ground for termination).

Ct. App. Apr. 17, 2014) (stating that there was not clear and convincing evidence that DCS made reasonable efforts to assist mother in establishing a suitable home where DCS offered to evaluate mother's future housing for safety but appeared to provide no other services); *In re Isabel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *8-9 (Tenn. Ct. App. Nov. 8, 2012) (finding insufficient efforts to assist parents in obtaining suitable housing where DCS provided lists of housing services and resources to parents); *In re C.H.E.H.*, No. E2007-01863-COA-R3-PT, 2008 WL 465275, at *11 (Tenn. Ct. App. Feb. 21, 2008) (finding that DCS put forth no evidence of its efforts to help mother obtain housing at any time and reversing the ground of abandonment by failure to provide a suitable home, where mother was released from incarceration and obtained family housing services by her own efforts); *In re K.E.R.*, No. M2006-00255-COA-R3-PT, 2006 WL 2252746, at *7 (Tenn. Ct. App. Aug. 3, 2006) (reversing the ground of abandonment by failure to provide a suitable home, where mother's child was removed while she was incarcerated, and it was "unclear whether the Department made any efforts to help [m]other procure housing during this particular period" of incarceration).

The record clearly indicates that DCS' effort exceeded those of the parents. "[T]he burden of family reunification does not lie entirely with DCS as reunification is a 'two-way street.'" *In re C.L.M.*, No. M2005-00696-COA-R3PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005) citing *State Dept. of Children's Servs. v. Belder*, 2004 WL 1553561, *9 (Tenn. Ct. App. July 9, 2004). The record shows that, although DCS referred both parents to programs to address their respective drug use and parenting skills, Mother and Father declined the referrals and scheduled their own treatment and parenting classes. Ms. DiRoma drove Mother to a few appointments, but the parents usually found their own transportation. However, the record indicates that DCS contracted with Holston Home to provide various services to the parents and the Children. These services included such as family therapy, individual therapy for the Children, transportation for the family, and supervised visits. Contracting for this service is evidence that DCS made reasonable efforts to assist the family. The record also shows that DCS worked with Father and encouraged him to separate from Mother so he could establish a suitable living environment for the Children. DCS caseworker, Ms. Rudder, transported Mother to rehab. Ms. Rudder also testified that, in August 2016, she helped Mother and Father obtain housing in a three-bedroom trailer by obtaining funds through the County Advisory Board. However, Ms. Rudder testified that the parents were evicted from that residence in early October 2016 for failure to pay rent. The record clearly and convincingly supports the trial court's finding that DCS made reasonable efforts to assist the parents in finding and maintaining suitable housing.

Despite DCS' efforts to assist Appellants in procuring sufficient housing, the trial court found, in pertinent part, that:

> [Mother] and [Father] did not have a stable situation and [M]other was not ever be [sic] successful with drug rehab despite several failed attempts.

- 13 -

[Father] condoned her drug use or engaged in drug use himself. Parents depleted funds on drugs when they did have money coming in. DCS continued efforts even after the first four months to provide transportation to connect the parents to available services such as Team Dad. DCS case manager, Katie Rudder, drove [Mother] to rehab facilities and the contract agency worker, Tommy Delbridge, transported the [C]hildren and supervised visitations. DCS invited parents to CFTMs and FCRB and referred parents to free parenting classes. DCS' efforts greatly exceeded the efforts of the parents. The parents often became *incommunicado* with their counsel and failed to follow up with services. They did not ultimately have a safe place to live or cease using drugs. The parents failed to attend meetings and court. Parents could not provide any kind of environment suitable for the [C]hildren. Mother's recent drug use has been very severe as reflected by her behavior on the witness stand.

This Court was particularly concerned about the significant fact of the parents receiving a settlement from a personal injury incident which [M]other spent on drugs. [Father] should have been well-aware of how the money was being spent. There was some testimony that he knew. By the time of trial, [F]ather testified that he had established housing and employment for only two weeks prior to Nov 23. This was too little too late.

From our review of the record, there is clear and convincing evidence to support the trial court's findings. Mother and Father have engaged in a transient lifestyle since the Children were born. Both parents have changed residences several times. Furthermore, the record shows that Mother continues in her drug addiction, and Father continues to enable her. Father's complacency, in this regard, has hindered him from establishing a suitable home away from Mother. When Father obtained money in the past, he has, on occasion, given it to Mother who used it to buy drugs. Also, on several occasions Father left Mother only to return to the same drug environment. This Court has stated that a "suitable home requires more than a proper physical living location." *State v. C. W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov.29, 2007). It requires that the home be free of drugs and domestic violence. *Id.* The pattern of behavior, by and between Mother and Father, clearly demonstrates that residential stability is not forthcoming. While there is evidence that Mother and Father took parenting classes, that Mother attended rehab on several occasions, that Father had some employment, and that Mother had a brief period of employment, the record is clear that the underlying issues, which prevented both parents from obtaining and maintaining suitable housing, still persist. From our review, there is clear and convincing evidence to support the trial court's termination of Mother and Father's parental rights on the ground of abandonment by failure to provide a suitable home for the Children.

**B. Failure to Substantially Comply with the Permanency Plan Vis a Vis Mother and Father**

The trial court found, by clear and convincing evidence, that Mother and Father's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan pursuant to Tennessee Code Annotated Section 36-1-113(g)(2). Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T[he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.*

With regard to whether the requirements of the permanency plans were reasonable and related to remedying the conditions that led to the Children's removal, the trial court found that the responsibilities set out in the permanency plans were reasonable and "related to remedying the conditions which necessitate[d] foster care placement." Neither party appeals this finding, and the record supports this finding. Accordingly, we turn to the question of whether Appellants substantially complied with their respective requirements under the permanency plans.

As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's

noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57. As discussed by the Tennessee Supreme Court,

[s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d at 548.

Because Mother and Father had different permanency plan requirements, we will analyze each parent's compliance in turn. As noted above, the trial court ratified two permanency plans. The first permanency plan ("Plan 1") is dated December 2, 2014 and was ratified on February 4, 2015. Mother was incarcerated when Plan 1 was made and did not participate in making Plan 1. However, Mother was present the day the trial court ratified Plan 1, and she agreed with the requirements of Plan 1. Father participated in drafting Plan 1 and signed Plan 1. The second permanency plan ("Plan 2") is dated August 10, 2015 and was ratified on October 7, 2015. Both parents participated in drafting Plan 2.

### *Mother*

Plan 1 addresses Mother's untreated mental health issues. Under Plan 1, Mother was required to complete a mental health assessment and "follow recommendations." She was also required to complete an assessment for psychotropic medication, to "follow recommendations," and to sign releases for DCS. These requirements were also included in Plan 2.

There is conflicting testimony regarding whether Mother completed a mental health assessment. Ms. Rudder testified that Mother told her that she completed the mental health assessment and that the recommendation was for Mother to continue individual therapy; however, Ms. Rudder received no proof that Mother completed the assessment. Mother testified that she completed mental health assessments in 2015 and

- 16 -

2016. Although there was evidence that Mother sought individual therapy, in her testimony, Mother admitted that she was not engaging in regular treatment for her mental health issues. This Court concludes that Mother did not substantially comply with this requirement.

The second concern addressed by the permanency plans was Mother's significant history of illegal drug use. To address this issue, Mother was required to complete a drug and alcohol assessment, follow all recommendations, and sign releases for DCS. In addition, Mother was required to submit to random drug screens. These requirements were also included in Plan 2, with the additional requirement that Mother would begin intensive outpatient treatment when she was released from jail.

Turning to the record, Ms. DiRoma testified that Mother completed an alcohol and drug assessment. The recommendation, from the drug and alcohol assessment, was for Mother to participate in a residential drug treatment program, after which she would participate in an Intensive Outpatient Program and Narcotics Anonymous ("NA"). The record indicates that Mother completed the substance abuse rehab treatment in May 2015, and she passed drug screens administered around the same time. Mother also attended a few NA meetings. However, despite Mother's initial efforts, she did not complete outpatient treatment prior to the hearing on the petition to terminate her parental rights. Therefore, we conclude that the evidence does not preponderate against the trial court's finding that Mother did not substantially comply with this requirement.

The permanency plans also addressed Mother's criminal issues. Under the plans, Mother would "resolve any and all criminal charges and not incur any further criminal issues/charges." As set out above, despite the requirement that she not incur further criminal charges, Mother's continuing criminal arrests, incarcerations and probation violations clearly indicate substantial noncompliance with this requirement.

To address Mother's inability to safely parent the Children, Mother was required to complete a parenting assessment and to demonstrate an ability to parent by engaging in therapeutic visitation with the Children. Turning to the record, Ms. DiRoma testified that Mother "completed some parenting form," but she didn't "know if it was an actual assessment." Mother testified that she completed a parenting assessment and took parenting classes. Ms. DiRoma confirmed that Mother completed parenting classes. Mother engaged in some visits with the Children. Although she did not always use good parenting techniques, causing the supervisors to intervene, she was present with the Children. It appears that Mother substantially complied with this requirement.

The permanency plans also addressed the unsuitable home environment Mother created for the Children. To remedy this issue, Mother was required to obtain and maintain appropriate and hygienic housing. In addition, Mother was required to obtain and maintain a legal source of income and to provide proof of reliable transportation. In

Plan 2, DCS reiterated this concern stating that "[Mother] is homeless and admits to sleeping in people's cars, street, tents and various people's couches." Plan 2 notes that DCS "would provide each parent the necessary documentation for them to apply for subsidized housing." The record indicates that it was not until December 29, 2015 that DCS provided the housing information contemplated in Plan 2, i.e. the Sevier County Resource Guide. However, Ms. Rudder testified that she worked with both parents to help them secure suitable housing. As discussed above, although DCS helped the parents procure housing, they were subsequently evicted. Concerning employment, during the pendency of this case, Mother attempted to receive disability payments but was denied. Thereafter, Mother worked sporadically cleaning cabins, but she was unable to maintain employment for any significant length of time. It is clear from the record that Mother failed to substantially comply with this requirement.

From the totality of the circumstances and the record as a whole, we conclude that there is clear and convincing evidence to support the trial court's finding that Mother failed to subsequently comply with the reasonable requirements of the permanency plans.

### *Father*

In Plan 1, DCS first addressed Father's "historical[] . . . use[] [of] illegal substances and prescription[s] . . . without [doctors'] authorization." To address this issue, Father was required to obtain an "A/D assessment and sign releases to DCS to verify completion, submit to random drug screens and follow recommendation of assessment." This requirement was also included in Plan 2. From the record, it is difficult to discern what steps, if any, Father took to address his alleged drug use. Regardless, there is little evidence to suggest that Father actually abused drugs. Testimony concerning drug use was directed toward Mother's use. In November 2014, Father passed a random drug screen. However, in February 2016, Father tested positive for marijuana. During his testimony, Father admitted to using marijuana. In a June 2016 test, Father showed negative for all illicit drugs. In short, the evidence does not clearly establish that Father has a drug problem or at least a drug problem requiring intensive rehabilitation. Accordingly, we conclude that his failure to comply with the requirements addressing drug use cannot form the basis for termination of his parental rights.

The primary concern with Father's ability to parent these Children stems from the unsuitable home environment. As discussed above, DCS made reasonable efforts to help the parents obtain suitable housing. However, Ms. Rudder testified that Father did not apply for housing assistance. Father obtained some furniture, and he further testified that he had procured suitable housing in Ohio in November 2016. The hearing on the petition to terminate his parental rights was also held in November 2016, but no evidence was adduced to corroborate Father's testimony or to prove the fitness of the Ohio residence. Concerning Father's employment, Ms. Rudder testified that she received two pay stubs from Father from March 2016, but she had not received proof of legal income since that

time. Father testified that he tried to keep a job and save money, but there was no evidence that Father achieved this goal. Father testified that he would have stable employment when he moved to Ohio. However, due to the fact that Father had only been working in Ohio for the two weeks prior to the November 23, 2016 trial date, there was no evidence that Father's employment was sufficient or stable. More concerning is the fact that Father's attempts to leave Mother and to refrain from enabling her drug use have not been consistent, and there was insufficient proof from which to infer that his move to Ohio will prove otherwise.

With regard to this ground, the trial court's found:

[The parents] were supposed to have a drug free home and attend meetings. They did not complete the recommendations of the alcohol and drug assessments they were supposed to complete. There was proof of erratic conduct by the parents. The plan called for them to obtain and maintain suitable housing. All proof that the Court has already cited . . . reflects that they could not provide a stable home for the [C]hildren.

As discussed above, the record contains clear and convincing evidence to support the trial court's findings. Mother's mental health and drug issues persist, as does her criminal activity. As to Father, he continues to engage, with Mother, in a transient lifestyle. To date, he has been unable to maintain stable housing or employment. Most importantly, however, he has been unable to refrain from enabling Mother in her drug use or to maintain his efforts to remove himself and the Children from her.

### C. Persistence of Conditions

The trial court found, by clear and convincing evidence, that Mother and Father's parental rights should be terminated on the ground of persistence of the conditions that led to the Children's removal from their custody. Tenn. Code Ann. § 36-1-113(g)(3). Tennessee Code Annotated Section 36-1-113(g)(3) defines persistence of conditions as follows:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or

- 19 -

guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

In *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn. Ct. App. 2005), this Court held that based on the statutory text and its historical development, the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3) provides a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse. As set out in the juvenile court's December 17, 2014, order, *supra*, the finding of dependency and neglect, in this case, was based on drug use in the home, instability created by Mother's untreated mental health issues, the family's unsuitable living conditions, and Appellants' unemployment.

In its order terminating Mother and Father's parental rights, the trial court found that DCS had proven, by clear and convincing evidence, that Mother and Father failed to remedy the conditions that led to the Children's removal from their custody, to-wit:

The [c]ourt finds by clear and convincing evidence that there is a persistence of conditions in this matter, namely, the parents' continuing substance abuse. The adjudicatory order reflects a problem with drug abuse. This [c]ourt agrees that the parents were not in a better place twenty four months after removal but in a worse place.

The [C]hildren have been kept in this status of hope but continuously have bitter letdowns because the [M]other and [F]ather remain in a culture of drug use. Both parents are totally responsible for that. . . . on October 28, 2016, [Mother] came into court clearly under the influence and testified that she had used drugs with [F]ather. Mother's drugs were just as bad on the date of hearings as it was in the beginning of the D&N case. . . . Although the parents had some gains in housing in the summer of 2016 and [M]other attempted rehab, the parents ultimately showed an unwillingness and an inability to make long term progress.

- 20 -

As discussed in detail above, there is clear and convincing evidence showing that Mother is still addicted to drugs, has not properly addressed her mental health issues, and has not established stable housing or employment. Likewise, there is proof that Father is unable to acquire stable housing and employment. Furthermore, there is evidence to suggest that Father is unable to separate himself from Mother so as to provide these Children with a stable and drug-free home. Given the pattern of behavior by and between the Appellants, there is little likelihood that the conditions that led to the Children's removal will be remedied at an early date. Accordingly, there is clear and convincing evidence to support the trial court's termination of Appellants' parental rights on this ground.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

\*\*\*

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child[.]

\*\*\*

Tenn. Code Ann. § 36-1-113(i).

This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*Moody*, 171 S.W.3d at 194.

Concerning the Children's best interests, the trial court found:

There is nothing to indicate that any additional time would assist the

- 22 -

parents in remedying their drug use or housing situation. Even when they obtained a substantial settlement, [Mother] wasted the money on drugs and [F]ather condoned that.

It would be an [sic] unlikely that [M]other and [F]ather will resolve the drug use or obtain suitable housing at any time in the near future. Normally it would be a positive thing for the court to consider the good relationship between the children and the parents, but this in effect gave and would continue to give the [C]hildren false hope about the possibility of reuniting with their parents. It is good for children to have a strong bond with their parents but it becomes terribly damaging to the children, even traumatic for the children, when the parents clearly and convincingly fail to remedy the conditions which necessitated removal for such an extended period of time.

The court has noted that the [C]hildren have significant needs and are in a safe placement and there is hope that an ICPC kinship placement may pan out. There is also a possibility for the Department to find an adoptive placement for the [C]hildren.

The record supports the trial court's finding that termination of the Appellants' parental rights is in the Children's best interests. The Children have been in DCS custody since November 2014. When they entered custody, the Children were 11, 9, 6, and 3. Now, the Children are 14, 12, 9, and 6. The Children have spent a significant portion of their lives in foster care while, to date, their parents have been unable to provide a stable and secure environment for them, *see discussion supra*. Given the fact that the parents continue in their detrimental patterns, it does not appear that postponing termination of their parental rights will result in permanent change. Furthermore, the record shows that all of the Children have some behavioral and/or physical issue. Children with special needs require even more stability and care than children without special needs. The record demonstrates that the Children are in a safe and stable foster home and school, where each child is receiving individualized therapy for his or her needs. To remove these Children from the only stable home they have known would likely cause detriment to their emotional, psychological, or physical well-being.

Nonetheless, Father cites *In re Kendra P.*, No. E2015-02429-COA-R3-PT, 2016 WL 4065491 (Tenn. Ct. App. July 28, 2016), to support his argument that, because the foster parents have not indicated a desire to adopt the Children, it is not in their best interests to terminate his parental rights. Father's reliance on *In re Kendra P.* is misplaced. Kendra P., unlike these Children, was approaching the age of majority so potential adoption was not the deciding factor in that case. Regardless, adoption and termination of parental rights are separate inquiries. Tenn. Code Ann. § 36-1-113(a), (d)(3)(C)(ii), (g)(8)(A), (h)(1), (l)-(p); *see State Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9 (Tenn. Ct. App. Sept. 10, 2002)

- 23 -

(juvenile court erred in refusing to terminate parental rights based in part on finding that child was unadoptable and that termination was therefore not in the child's best interests; while the evidence showed that future placement would be difficult because of the child's physical and mental problems and relatively advanced age, it did not show that a future adoption was impossible). Here, there is proof that neither Mother nor Father is capable of caring for the Children in a stable, drug-free home. There is also evidence that the Children's behaviors are improving with individual therapy and counseling and the support they receive from their foster parents. At this juncture, a safe and stable foster home is what is in each child's best interest. Accordingly, we conclude that the facts, as found by the trial court, are supported by the preponderance of the evidence and clearly and convincingly establish that termination of Mother and Father's parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the order of the trial court terminating Mother's parental rights to all the Children and Father's parental rights to Damian O. and Seriah O. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed one-half to Appellant, Elizabeth E., and one-half to Appellant, Antwoine O. Because Elizabeth E. and Antwoine O. are proceeding in forma pauperis in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE